Good morning ladies and gentlemen, please be seated. With the lawyers who are going to be speaking, I would like to introduce Deborah Lovie from the Exoneration Project on behalf of the appellant S.E. Nooner. Good morning Assistant State's Attorney Andrew Yasson on behalf of the people. So that you all both know it is normally our habit to give you 15 minutes each to argue. We do take into consideration the fact that we may ask questions and so we may extend that time. Would you care to reserve some time for rebuttal? Yes, please. May I reserve five minutes? You certainly may. All right. With that, if you are, if there's nothing else, then we will begin. All right. Thank you. Good morning. S.E. Nooner is 15 years old with no prior arrests, a severely traumatic childhood, learning delays, and no active participation whatsoever in this crime. He was convicted of murder and attempt murder and sentenced to 56 years based on a theory of accountability for felony murder. This morning I would like to argue that appellate counsel was ineffective for not contesting this conviction based on the insufficiency of the evidence and that S.E.'s sentence violates the proportionate penalties clause as applied to him. I'd like to begin with the insufficiency of the evidence. Now, there are two possible ways of getting to a felony murder conviction. You either have to have accountability or a common criminal design. And the evidence is insufficient under either theory. So if we begin with accountability, in order to prove that any Can I add? Yes. I really hate to stop you, but I want to know how. How do we get to the insufficiency of the evidence on a remand? I'd like to hear that argument. Absolutely, Your Honor. So this is still the direct appeal. This is the remand on direct appeal. And in Pupil v. Veach, the court made it clear that if it is apparent from the record that it needs to be raised at that first available time. And in Coustoc, the court actually thought Well, on the first available time, it was on direct appeal from the first It was the first direct appeal, exactly. And so in this appeal, this is still the direct appeal. I'm arguing that appellate counsel was ineffective, that this issue was a glaring issue based on the record that was before her, and that she rendered ineffective assistance of appellate counsel by failing to raise it. If this court finds that the underlying issue is meritorious, then it would so find that counsel would have been ineffective for not raising it. Because otherwise, nobody ever hears this issue. If you wait until post-conviction, it's too late, and appellate counsel was ineffective. But Essie has a very strong claim of insufficiency of the evidence, and if this court doesn't choose to hear it, it never gets heard. And Veach says you have to. Let me ask you about Veach for a second, okay? Sure. Sorry. Veach was ineffectiveness of trial counsel, right? There's no mention in the opinion at all about appellate counsel. And then also, it was regarding defendant's initial appeal, right? So how does, factually, how does Veach apply to this case? Well, I mean, look at how Veach is applied in Coustoc. In Coustoc, they tried to save it for post-conviction, and it was, the court said, oh, no, you can't, you don't have anything new in post-conviction to add to this. It's apparent from the trial record it had to be raised in direct appeal. And so Essie would essentially have no opportunity to ever raise this if you don't let him raise that his appellate counsel was ineffective. There's no reason why a first direct appeal or a second direct appeal would be any different. We're still on direct appeal, and we're still saying that counsel should have raised it. So, I mean, the alternative would be to wait until post-conviction.  But there's nothing new that would happen on the post-conviction record. There's nothing additional that would be before the court at that point. It would still be ineffective assistance of appellate counsel, which is entirely apparent on this record, and there's nothing new that post-conviction would add to that adjudication. So Coustoc suggests that we have to raise it now, and that the court does have to raise it later. If the court disagrees with me, I hope that it will at least provide language that says that this is available at post-conviction as something that should be heard so that Essie isn't boxed out by Coustoc and then, you know, hit either way. He couldn't do it here, and he couldn't do it there, because that's what happened to Coustoc, and he was never able to raise it. But it was on a direct appeal, a first direct appeal, not on a remand in which you're limited to the issue that you're on remand. Correct. I mean, I understand why the lower court was hesitant to hear it, but this court can hear it, and this issue has been fully briefed on a complete record, and so I'm urging this court to hear it, because the difference between a first direct appeal and a second direct appeal doesn't affect the underlying merits of the issue and therefore shouldn't affect an adjudication. And again, just putting it to post-conviction doesn't add anything to the record. This is someone who's already served 12 years on really strong evidence that they didn't, you know, that he didn't do anything wrong, and I'd love the opportunity to argue with you about how there was insufficient proof. But again, if the court disagrees with me on this, I would at least ask the court to please make it explicit that this issue is available in post-conviction so that it's not a situation where Essie never gets to raise the fact that the evidence was insufficient. Well, the fact that you're raising it now, I mean, you're basically preserving it for post-conviction if we ever get there, right? I mean, I'm hoping that the court will hear it now. And so, you know, I guess I don't have much more to say. This court has the jurisdiction to hear it, you know, regardless. It can hear this issue, and I'd love the opportunity to try and persuade you that the evidence really was profoundly insufficient in Essie's case. So the way you get there is you either have to prove accountability or a common criminal design. So let's start with accountability. For accountability, you need intent, and he wants to do something to aid or further the crime. Knowledge or presence are not enough. So even if you fully credit the state's evidence and you give them that maybe there was knowledge of something happening and knowledge of a plan, the only actions that Essie is ever accused of taking is sitting in the backseat of the car and reporting this crime to the police. Now, that was the point there. I thought that the records said that there was testimony that he directed the deceased to the location where the cars were. I have several points made on it. First is, no, the witness actually corrected herself. And if you look at supplemental record at 801, she admits that when she circled it for the police, she circled the co-defendant, not Essie. And if you look at the record at 797, she admits that in her statement to the state's attorney, she said it was Roberson, not Essie. So the witness did the direction to the location. They gave the direction to the location. But the next thing I would want to remind the Court is that regardless, and those are two sites where it's really clear that it was Roberson who gave the directions, not Essie. But regardless, McIntyre and Killam had bought from these two co-defendants on four or five other occasions. They had gone there four or five other times. And the location really had nothing to do with this crime. Basically, the victim put the car in reverse and Gilear executed him. It could have happened anywhere. So whether Essie said 23 North Oden Street isn't essential to this crime and the witness did correct herself that it was actually Roberson that gave the directions. All Essie did was sit in the back seat and then report this crime the next day. But what about the fact that he was aware of the plan? McIntyre, before all this started, had indicated someone was going to go down. And Essie participated in the plan, was aware of the plan, did nothing to try to intervene or prevent the shooting from taking place. What about that? Okay, so that's the common criminal design theory, which is different. It doesn't require the action. So accountability is, you know, he didn't do anything. But it was a common criminal design. Well, if you look at the evidence, and again, putting it in the State's favor, what the design that Essie thought there was was arguably, we dispute, but their best case scenario is that he thought that there was going to be some kind of armed robbery or something. That's not what Gilear had in mind. Gilear's plan was an execution style murder. He didn't take anything. He didn't speak to this man. He didn't wait for the guy to put the car in park. He just shoots him in the back of the head. And all of the players who are closest to this crime recognized that that wasn't Essie. Essie wasn't part of that design. The court, you know, says I'm absolutely certain, I'm totally convinced that Essie Neuner did not want Mojan to be shot. I saw the custodial interrogation. I heard him at the motion to suppress. He was hysterical. This is not what he wanted, according to the court. The State's attorney wrote to the governor. Again, Essie did not shoot either victim. Essie did not possess a firearm or did he help or facilitate this crime in any way. There were never any allegations that Essie directly participated in the crime. And even the jury was asking, can't we do something less than first degree murder? So the players that were closest to this recognized that there wasn't actually a shared common design. That Gilear had some, you know, Gilear had some plan of executing this person, and Essie was a naive, developmentally delayed kid who thought that, you know, his friend was getting a deal on televisions and he was coming along to watch. Or, you know, even crediting the State's evidence, thought there was some kind of money in it for him. But that's not the design that Gilear had. And if they don't share a criminal design, you can't pin it on the kid. 56 years he is serving, 56 years. He's already served 12 on what wasn't a design. And I tried to think of an example just to sort of put it in another perspective of this. If you imagine a group of kids, teenagers, talking, you know, after school, I hate math class. One of them is flicking a lighter and saying, we should burn down the math class. And they're all being like, yeah, totally, that'd be cool. And then they go to get lunch and they walk into the math class. And lo and behold, one of the kids they're with pulls out a can of gasoline and torches the math room glass. You know, did those other kids truly share a common design to torch the school? No. I mean, as he talked, according to worst case scenario for me, as he talked about, you know, we should get some money out of this. And, again, that evidence is pretty dubious. It's really as he's moving along to the cops because he feels really guilty. But even worst case, if he thought that there was going to be some kind of armed robbery, that's not what Gilear's plan was. Gilear had a whole different plan. He came in execution style, shot as his friend, you know, someone he loved in the back of the head. No words, no attempt to steal anything, leaving drugs on the counsel, money on the passenger seat, money on the victim. They didn't share a common design. Counsel, isn't much of what you're doing now just your – it's your interpretation of the evidence? Wasn't the trier of fact who heard this able to either give the evidence the interpretation that you're giving us now or to draw a different conclusion from that same evidence? Well, again, I'm trying really hard to credit the state's evidence. All the evidence ever said, though, was that Essie had – you know, that Essie was participating in conversations about an armed robbery and that there was – They all murdered him. And there's really – nobody ever talks about – Essie – the conversations – and, again, crediting their evidence that he heard that Gilear was going to – the robbery was going to kill somebody. Again, it's very different than what Gilear actually did. To have a common criminal design, you have to have intent and action and furtherance in that shared intention. But aren't you just giving your interpretation of the evidence? The jury was certainly free to give whatever weight it chose to this evidence regarding what Mr. Neumann knew as far as Gilear's plan and his participation in that plan. I mean, whenever you're arguing insufficiency of the evidence, you always have a trier of fact who has found guilty. So you always have that hurdle. And this Court has to still – has an obligation to look at that evidence and say, really, is that enough? Murder is the most serious crime out there. Do we have enough here to really believe that this kid was part of a common criminal design or that he did something to further this crime? And I'm trying to argue to the Court that even crediting the State's evidence, he didn't. He heard it. He sat in the car. He reported the crime, you know, almost immediately after it happened. He was, you know, heartbroken about what happened. He's done nothing. But, you know, and most of the evidence is him saying, you know, oh, my God, I knew this would happen. And for that, it's being held against him. And so, I mean, it is always the hurdle. The jury always could have. I'm arguing it's insufficient. And I'm asking the Court to take a real hard look at that evidence and to see whether or not it truly is sufficient. And if it isn't, to reverse this conviction for us. I do want to save time to talk about the sentencing issue. That's where I want to go. Thank you. Because regardless, you know, we do have a Proportion of Penalties Clause claim. It is reviewed de novo under Spencer. And under the Proportion of Penalties Clause, all penalties are determined based on the seriousness of the offense and with the objectiveness of restoring the offender to useful citizenship. And now, starting with the seriousness of the defense, people who know the Illinois Supreme Court case, not the U.S. one, talks about it incorporates the personal culpability. So, yes, murder is a serious offense. But you look at Essie's actions and the seriousness of what he did in this. And in this case, you know, if he did do anything, it was pretty minimal. He sat in the car and he reported it. And then the other side of that is looking at restoring the offender to useful citizenship. And the evidence here is unrebutted. Essie saw his mother kill his father at a very young age. He lost both. Dr. Garbarino talked about how that delayed Essie's developmental growth. But nevertheless, Dr. Garbarino has seen developmental growth, emotional intelligence, and Essie readying himself with the skills he needs to return to society. This is someone who had no criminal history, not even a prior arrest. He's had no prison infractions. He's had a solid work history in prison throughout. He's done all the educational programming one can do. And he has strong relationships. This is a situation where 56 years does not accurately reflect what the appropriate punishment should be for Essie. How do we change that when he's got the minimum sentence in both of the charges? Well, so this Court has that authority to go when the minimum sentence, and that's what Spencer talks about. When the minimum sentence exceeds what is right, exceeds when you measure the seriousness of the offense, the objective of restoring him. If the minimum sentence is too high, this Court has the authority to reduce the sentence to below the minimum. And Illinois Supreme Court Rule 615b-4 gives this Court the power to reduce the punishment. It is not restricted based on, you know, statutory minimums or anything like that. So, you know, there might have been some question, and I've gone back and forth about what the Court could have done with this. The Court would have had to consider the proportionate penalties clause in order to go below the mandatory minimums. This Court should consider the proportionate penalty clause and think about what is a constitutional sentence, what is right. I argue that the State's attorney three years ago argued that what Essie had already served at that point, nine years, was sufficient. The State's attorney specifically wrote to the gunner saying she was advocating to have Essie's sentence commuted to time served. She talked about overly harsh sentences. She talked about it being excessively punitive. And that, to me, is telling. When the State's attorney makes that kind of admission, that's what this Court should – if the Court wants to keep the conviction intact, it should reduce it to the nine years that the State's attorney was asking for. Do I have a question about Dr. Garbarino's conclusions?  The trial court on the record indicated that one of the things about Dr. Garbarino's report was that it was only based on one interview. It was only done over a couple hours. And there was no verification at all whatsoever of what the defendant had related to the doctor. And that's what the trial court looked at when it was considering Garbarino's report. Yes. Well, I think as for – I guess there are sort of two parts to that. One is the methodology and one is the verification. As to the methodology, there has been no counter-expert. Dr. Garbarino is extremely well-respected. He has a CV, you know, pages long. I think that for the Court to question his methodology based on – you know, he ran the tests he ran. He is a highly respected expert who says that he's able to opine based on the amount of time that he had. And for the Court to just reject him with no counter-evidence, with no suggestion from any other expert, that his interviews were insufficient or that the time he spent with Essie was insufficient was an error. You know, you had uncontested evidence there. With regards to the verification, I mean, much of what Garbarino is depending on, it has been independently verified. We know that when Essie was 7 years old, you know, he had grown up in a home with domestic violence. His father had an order of protection against him. His mother had broken bones at hospital visits. And when he was 7 years old, his mother stabbed his father. Whereas he idolized that he, at 7, saw that, you know, and his mom gets arrested. She goes to a mental institution. He loses both parents at 7 years old. You know, old enough to understand that his mom comes in to call the police. You know, there's blood on her. For Dr. Garbarino to say that, you know, this along with the neighborhood – I mean, whether or not – the things that the Court was taking issue with, the sort of petty differences of whether or not, you know, at what age he started drinking alcohol, is not – you're missing the forest trees there. The big picture is that this is someone who grew up in a really, really challenging environment without parents to tell them, hey, don't get in the backseat. Like, if your friends are talking about doing something crazy, don't get in the backseat. Like, that's what he needed. He needed parents to tell him that. And Dr. Garbarino is saying he was essentially a traumatized child in an 18-year-old's body. And to throw a 56-year sentence at him seems really unfair based on who he was and the amount of trauma that he faced. So the courts were – I mean, the court found reasons that, you know, as he talked about his – described his relationship as okay at this point and not so great at that point. All of the differences between the PSI are accountable to different phrasing and also show taking more accountability over time. So, you know, it checks with what Dr. Garbarino is telling us, which is this is somebody who grew up with a tremendous amount of trauma, who grew up with a developmental delay, but who has made it, who in prison has been doing – you know, and again, verifiable, and it's part of the record that he's been doing all the educational work. He has had no prison infractions. He has been working steadily in the kitchen throughout with letters from his family to show that he has developed the kinds of relationships that we would like to see. So, you know, the bulk of Dr. Garbarino's things that he was relying on are all verifiable throughout the record. Okay. Thank you, counsel. So unless there are further questions, you know, we are asking at minimum that the court decrease the sentence to the nine years that the state's attorney asked for. Thank you. Good morning. Good morning. May it please the court, counsel. So this case should be affirmed for three reasons. Number one, defendant's reasonable doubt claim is forfeited and can't be raised through a new ineffective assistance and fellow counsel claim from a resentencing hearing. And even if this court were to reach the merits of the claim, he can't establish either deficient performance or prejudice because viewing the evidence in a light most favorable to the people, he was proven guilty through both theories of accountability. Additionally, his sentencing claims fail because he was, because the resentencing court conducted a full Miller-compliant hearing, considered all the mitigation evidence, and ultimately rejected his claim that he was the functional equivalent of a juvenile. Regarding his reasonable doubt claim, he doesn't argue that that's not forfeited. He recognizes it wasn't brought up on direct appeal so that it is forfeited at this point. So the only way that he can get that claim before this court is by bringing it up as an ineffective assistance of appellate counsel claim. As we all go through our lines, what's your take on the defendant's reliance on Veach? It's our position that Veach, Kustak, and Sturgeon are not applicable because in those cases it was a trial court or a trial issue, an ineffective assistance of trial counsel that was brought up before the court on direct appeal. Direct appeal happens, so it's trial, then it goes up on direct appeal. Then now we're at remand. We're at remand for resentencing for the sole purpose of resentencing. So the only issue before this court, the only issue that was before the resentencing court was the sentencing issue. So now that we're at this level, we agree we are still on second direct appeal. But if the direct appeal or if the issue could not be brought up now, the reasonable doubt claim could not be brought up now because it's been forfeited, nor should the ineffective assistance of appellate counsel issue be able to be raised. That is properly preserved or reserved for the post-conviction hearing. Each of those cases discussed ineffective assistance of trial counsel. This is different. This is ineffective assistance of appellate counsel, and this is from a resentencing hearing that is attempting to be brought before this court. In his reply brief, defendant relies on People v. Campbell and refers to a second direct appeal. We agree this is a second direct appeal, but Campbell actually helps our position because the court there limited their review to what occurred during the resentencing hearing. The court specifically said, In any event, we have found no error by the court on remand or abuse of discretion in the sentencing post. That court only considered matters from the resentencing hearing. And actually, Robinson, that the defense cites in their reply brief, helps our position even further. In Robinson, the court said, The rule is clear that issues that could not have been raised in an initial appeal, or I'm sorry, that could have been raised in an initial appeal but were not, cannot be raised in a second direct appeal. That's the reasonable doubt claim. They went on to say, Issues that were not raised in the first appeal are considered forfeited, and the second appeal brings up nothing except proceedings subsequent to the remandment. That means only the issues that were brought up at the resentencing hearing. However, even if this court does reach the merits of the issue, the defendant can't establish an effective assistance of appellate counsel. He can't establish, I'm sorry. I was just thinking, even if they haven't preserved it for judicial economy, given that it's been fully briefed by both sides, is there an objection to us considering it? I would not say I have an objection to, Your Honor, considering it. In fact, I think it would save time because we are confident in our position that he cannot establish the effective assistance of counsel, nor the reasonable doubt claim. So we would not have an objection to considering it. However, with the language and being very explicit, that it is not properly raised at this time. So regarding the prejudice, the defendant can establish a prejudice because this reasonable doubt claim would not have succeeded had it been raised on direct appeal. To establish that prejudice, he would have had to show that viewing evidence in a light most favorable to the people, that no rational trier of fact could have found him guilty beyond a reasonable doubt. But he can't meet that burden here. He's improperly asking this court to re-weigh the evidence. In both the opening and reply briefs, he's portraying the evidence in a light most favorable to himself. That's not the standard. The standard is whether any rational trier of fact, viewing the evidence in a light most favorable to the people, could have found him guilty. The jury already heard and weighed all the evidence in this case, and that he wants Your Honors to consider, and they rejected it. They credited the prior consistent, I'm sorry, the prior inconsistent statement of the witnesses that flipped at trial. That included the grand jury testimony, the handwritten statements, the videotaped statements. All of those were submitted, admitted substantively. This court's not retrying the defendant. His argument's just a request that this court reassess the witness credibility and re-weigh the conflicting evidence. But that's not the role of this court in reviewing a reasonable doubt challenge. So, when viewing the evidence in a light most favorable to the people, his accountability was actually proven under both theories. Under common criminal design, he was participating in a plan to rob John. The evidence showed that he discussed the plan to rob John beforehand, he participated because he wanted the money, he knew William had a gun, and he was going to shoot John, and he went along to carry out the robbery. No, that's the argument. He just went along. He didn't really actually do anything actively or engaged in any manner, shape, or form in the actual incident. Their theory is he was just along for the ride to get the money. Right. I understand that's their position, but it's the state's position, and the record shows that his role in this crime was essential. He admits in his videotaped statement that he's the reason that John came along to begin with. John would not have been there but for him being there. John trusted him. William knew that he needed him there because of that trust, and his relationship with John was the reason he went along. It is our position that he is the one that directed John where to go when they were in the car. I know counsel is citing to the record, I don't have that in front of me, so I don't know those, but in our brief you cited. We'll look it up. Thank you. In my brief I cited three different places in the record that shows that John was directed by the defendant, so I don't unfortunately have an answer to that right now. But it is our position that he actively helped carry out the offense, not only by being there, but also by directing him where to go, and his statements confirmed his level of involvement. He admitted that the robbery was discussed beforehand, that he knew William had a gun, he knew John trusted him, and that he needed him to be there to get John to come along. So at a minimum, the evidence established that he was participating and knowing an active participant in the plan to rob, in the armed robbery, and that the shootings occurred in furtherance of the common criminal design. And the evidence also supported that he shared the criminal intent with his co-defendants and that he intended that both John and Najee be shot. The evidence established that the defendant knew William had a gun, knew William intended to shoot John, he admitted that he expected that the shooting was going to happen after the robbery. He didn't think it was going to happen before. That's important. And he also stated that he wanted any witnesses to be killed. He said that. That was testimony that he specifically said that they're going to kill any witnesses. That would be Najee. That's from Mr. Stokes. I'm sorry? Was that from Mr. Stokes? I don't recall specifically that he said it, but I do know that somebody overheard him say, those were words attributed to him specifically, that he was going to kill any witnesses. And that was in discussion of the plan and what they were going to do with John. So he can't establish that no trier of fact would have found him accountable under a shared intent theory as well. All of his arguments focus on re-weighing the evidence. He's attacking witness credibility. He's relying heavily on the testimony at trial of the flipper witnesses. But, again, that was for the jury to decide. They were entitled to credit the prior statements and over-the-trial recantations, and that's what they did here. So the testimony of those witnesses provided at trial is really irrelevant to the question before you, others, of whether viewing the evidence in the light most favorable to the people, could any rational trier of fact have found this defendant guilty under either theory of accountability? And the answer is yes. So, therefore, this defendant can't show that he was prejudiced by his attorney failing to raise him. And, similarly, for very similar reasons, he can't show that his attorney was deficient for failing to raise an issue on direct appeal. Regarding the sentencing, the proportionate penalties claim and the abuse of discretion claim that he raises on appeal, the State's view of those is that they're both intertwined because they both rely on the same premise that he was the functional equivalent of a juvenile at the time of the crime. Importantly, he received a full Miller-compliant sentencing hearing, and the resentencing court gave him the opportunity to develop the record and argue that he was the functional equivalent of a juvenile. And after considering all that evidence, the jury – I'm sorry, the court rejected the argument and the defendant – and that the defendant should be sentenced as a juvenile. So unless that determination was an abuse of discretion, the proportionate penalties claim necessarily fails as well. The court didn't abuse its discretion. It carefully considered the mitigation evidence. It considered Dr. Garbarino's testimony, the defendant's mother's testimony, the 2018 PSI, the 2022 PSI, and the defendant's overall personal history and circumstances. The court was not – One question about Garbarino's conclusion. Should the trial court have been permitted to entirely disregard Garbarino's conclusions, which is what it seems like in the record. The trial court didn't consider him at all. I think that's the entire point of the hearing, and having someone testify is for the trial court to make the ultimate decision on whether or not that this person should be sentenced as a juvenile. That was the question that the court was needing to answer. Should this person be extended juvenile sentencing protections? And based on Dr. Garbarino's testimony and the other testimony that he considered, the trial court found that the answer was no. I mean, in large part, the trial court recognized that a big part of the problem with Dr. Garbarino's testimony was that it was based on the short two-hour interview with the defendant and also that a lot of that information was self-reported, which was contradictory to the information he had previously reported. The 2018 and the 2022 PSIs had substantially different information, such that this ACE score that Dr. Garbarino had used to come to his conclusions would have been materially affected. It would have been several points lower and may not have resulted in the same conclusion that the doctor had reached. What about their point regarding the state didn't offer any other experts to counter Garbarino or any other reports to counter Garbarino? You know, so the trial court just basically said, I looked at Garbarino's report, but I'm not considering it. Well, again, it's our position that is the function of the trial court is to weigh the evidence before it and determine the credibility of the witnesses before it. Also, it's our position that would be improperly shifting the burden to the state. If the defense hires an expert and the expert testifies, now essentially that would be the state's burden to rebut that testimony rather than leaving it up to the trial court to resolve any discrepancies or inconsistencies. And also, Dr. Garbarino was very specific as to what he was doing there. He said and expressly disclaimed that he was not giving a clinical diagnosis. In his memo to the defense, he specifically stated that he was acting as an educational witness, not offering a clinical diagnosis. He said, quote, first, I am not offering any clinical diagnoses of Essie, but rather serving as an educational witness to provide a developmental perspective on the information available to me regarding his pathway from childhood to adolescence into adulthood, to which the diagnoses offered by clinicians can contribute. So it's not the same as factual testimony that comes out that a court would just randomly reject or even medical testimony that's provable through objective medical scientific ways. This is materially different. This is general educational testimony that Dr. Garbarino provided about adolescent development and how that applied to this defendant. And the court had discretion to reject that. I mean, as I already said, if the court did not have discretion to reject that, then there really would be no purpose for the hearing. He would just automatically, every defendant would automatically get these juvenile sentencing protections every single time an expert was hired. It's up to the court to resolve any discrepancies, review those pre-sentence investigation reports, which, again, had major discrepancies, and that affected his ultimate conclusions. Because this defendant received a Miller-compliant sentencing hearing, the resentencing court did not abuse its discretion in refusing to sentence him as a juvenile, and he can't show that his sentence violates the proportionate penalties clause. The sentence is not cruel, degrading, or wholly disproportionate to the offense when considered in light of the gravity of the crimes and the fact that there were two victims in this case. He received a minimum sentence available for an adult offender. He did not receive a de facto life sentence because he's parole eligible after serving 20 years. Okay, and can I ask you a question I don't know the answer to? The co-defendant Roberson, who was, I think, maybe 15, died 40 years. Is he eligible for the parole consideration after 20 years, or does he have to serve that whole 40 years? I think it depends on when he was sentenced. It has to be after.  That's what I did. I'll look it up. I just thought you might know. I'm pretty sure it's after. I don't remember the name of the case, but it's after it was established that 20 years allows for parole eligibility. Was that Spencer? Yes, it was Spencer, yes. So both Spencer and Elliott agree that the defendants that receive these sentences that are under 21 at the time are parole eligible after 20 years and that those are not de facto life sentences. And he cannot show a violation of proportionate penalties because his role in this crime was substantial. Again, he was not the shooter. The evidence showed that he discussed the robbery plan beforehand. He knew William intended to shoot John. He wanted any witnesses to be killed, and he used his friendship with John to lure him into the situation. The case that the people signed, People v. Jones, is directly on point, and it closely mirrors this case. Both Jones and this defendant had their original sentences vacated and were granted for resentencing hearings. They had opportunities to develop the records as to their personal circumstances in full Miller-compliant hearings. They were convicted on theories of accountability. They were both older teenagers when they committed the offenses. They had fathers that were killed by their mothers. They grew up in adverse circumstances. They were both analyzed by Dr. Garbarino. They both took this ACE test and were placed in the 0.01 percent of the population. They were both described by Dr. Garbarino as living in toxic social environments and in war zones. They will be both eligible for parole after serving 20 years of their sentences. And just as in this case, the court on remand in Jones declined to sentence him as juvenile. The court rejected the proportionate penalties claim in Jones for four reasons. Number one, he didn't receive a life sentence. Number two, he wasn't a juvenile when he committed the offense. And number three, he was an active participant in the robbery. And four, the resentencing court specifically considered how his adverse childhood affected his brain development at the time of the offense. So that same reasoning applies here. This defendant did not receive a life sentence. He is now a juvenile. He was actually only 40 days shy of his 19th birthday at the time of the offense. He was an active participant, and he was the reason John went with them in the first place. And he had a full Miller-compliant hearing before the resentencing court, where the court specifically considered how his adverse childhood affected his brain development at the time of the offense. So for those reasons, the people who are respecting him are responsible. I have one other question. Counsel, may I ask? Sure. The 2023 letter from the state's attorney to the governor, isn't that an indication that maybe the sentence was excessive? Well, that letter was actually written before this sentence was imposed. That was from 2023. This sentence was imposed in 2024. And it doesn't answer the question, and it didn't address whether a sentence would violate the proportionate penalties clause. The letter was just a policy-based request for clemency, and it doesn't have anything to do with whether or not the sentence that has been imposed now is violated with the proportionate penalties clause. So, if you're okay with that, are there further questions? So for those reasons, we're asking that you affirm the defendant's convictions and his 56-year sentence. Thank you. Thank you. Hello again. The state fundamentally misunderstands an aspect of the sentencing claim, and so I really want to make sure that we're clear here and that this is clarified. The proportionate penalties clause claim is not dependent on Essie's age. It stands either way. This claim would be strong if Essie was 35, if he was 45 years old. He still has a proportionate penalties claim, and the state has missed that aspect of it. It's only looking at it through the lens of what do we do with emerging adults. But when you're dealing with a proportionate penalties claim, there are two things that the court has to consider, the seriousness of the offense and restoring the offender to useful citizenship. For the seriousness of the offense, what the state is missing is that Miller, people v. Miller, tells us you have to look at the personal culpability. So you have to look at what Essie himself has done. And the state has, and restoring to useful citizenship, I haven't heard any argument disputing that Essie is well on his path if the court agrees with regards to the personal culpability. So I want to talk about that, folding in the arguments on reasonable doubt. The things that the state is pointing to as culpability, the idea that Essie lured the victim, McIntyre was a drug dealer seven years older than Essie. He had bought four or five times with his girlfriend, who knows how many times without his girlfriend, from the two co-defendants without Essie. So to say that Essie was the bait that lured him is just wrong. They were doing these sales all the time without Essie. Again, to say that Essie was giving the directions for this, again, is wrong, and I saw Your Honor write down the cites for that. But regardless, the location didn't matter. It wasn't like they had to get him to a specific place. Gilear just, at the moment, he was in reverse, pulled out a gun and shot him. So, again, Essie hasn't done anything. He didn't, you know, for all the talk of Essie wanted to shoot witnesses, he didn't bring a gun. He didn't have a weapon. He sat there, and he reported this to the police the next morning. So when you're looking at the seriousness of the offense, that's the culpable conduct. That's what the court has to look at. And then the court should consider, in addition, Dr. Garbarino's testimony that Essie was essentially a traumatized child, and look at the sentence in that way. But the proportion of penalties clause is not dependent on whether or not the court decides that Essie was essentially 12 or essentially 15 based on the trauma or working out whether his PSI was slightly different. Nobody disputes that this was somebody who was severely traumatized, who has nevertheless managed to restore himself to useful citizenship. And that's why I do want to return to Your Honor's question about the State's attorney. I think it's really important. The State's attorney at the nine-year mark said enough is enough. We think that he has served sufficient based on the conduct. And that is the answer. That is a concession. That is the answer to our proportionate penalties question, to look at the culpable conduct, to look at the goal of restoring him to useful citizenship, to put those two together and say, what really is a fair sentence? Should this person be serving 56 years for what he's accused of doing, even crediting everything that the State has to say? The State's attorney said that at the nine-year mark, enough is enough. Did she know that it was going to go from 65 to 56 to 56 at that moment? No. But either way, she thought it was excessive and she said, time served, not take it to 56 or maybe 56 would be enough. She said, commute now. So I just want to make sure that the court is clear and doesn't go down the hole of what do we do with emerging adults. Yes, I see as an emerging adult, yes, he was essentially a traumatized child. But that is not the heart of this claim. The heart of this claim is that what he's accused of doing is a severe mismatch for murder and attempted murder convictions, if the court wants to consider that issue, or at minimum for the sentence that he is serving. He's been in for 12 years. He is ready to come out. And I'm asking the court to do what it thinks is just. Thank you. Thank you, counsel. Thank you. Any questions? No. Thank you. No, you're fine. You're fine. Thank you. We thank you both for being well prepared. And we appreciate that. And we shall issue a decision. All right. I just got the permission to do this. I just looked out in the audience. I'm seeing supervisors here in the office. I mean, at least three from the state attorney's office. I see some assistant state's attorneys who are in the office. And I just think it's wonderful that you're all here watching this young man. And I did want to say it is nice. First, I'm going to. No. No. I was going to say, I enjoyed both arguments. But I mean, you're very confident, so there's no issue at all. But I just wanted to remark for you that you started out as if you were tentative and you've blossomed. So I just want to, I know the supervisors should be clapping for you because we ask a lot of questions because we take our jobs. Seriously. So I want to thank you for a wonderful argument for you. For a wonderful argument for you. Supervisors for being here to help them get better. That's all I want to say. And I don't know. You never appeared in front of me at 26th Street, did you? No. I know, I think John Lowe. Yeah. But tell him I said hello. Because you used to appear in front of me quite a bit there at 26th. All right. Thank you all. With that we will stand adjourned. All right. Thank you, everyone.